### QUAKER OATS CO. v. GRICE.

*(Circuit Court of Appeals, Second Circuit.   March 15, 1912.)

No. 137.

1. EXPLOSIVES (§ 7*)—DANGEROUS PREMISES—FIRES—LIABILITY.

Where a grinding mill and elevator used for the manufacture of mixed feed was allowed to become unsafe because filled with dust which would explode on the application of a spark or flame, and the owner could in the exercise of reasonable care have prevented the premises from becoming thus unsafe, and an explosion occurred causing a fire which was communicated to the property of an individual, the owner was guilty of actionable negligence, though the spark which fired the dust was produced by an intruder.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

---

2. EXPLOSIVES (§ 7*)—DANGEROUS PREMISES—FIRES—LIABILITY.

Where there is a device in common use and adaptable to the work in a grinding mill, which a man of ordinary prudence would adopt to keep dust out of the air, the owner of the mill must install such a device, and failure to do so is actionable negligence, rendering him liable for a loss occasioned by an explosion of the dust.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

3. EXPLOSIVES (§ 7*)—ACTIONS—VERDICT—GENERAL VERDICT.

Where the jury could find under the evidence that an owner of a grinding mill was guilty of actionable negligence in failing to install in the mill a device to keep dust out of the air, a general verdict against him for loss ·of property by fire caused by an explosion of the dust was warranted, and his liability for the loss was sufficiently determined whether the fire that ignited the dust was caused by his negligence in allowing spontaneous combustion to be generated in its stored shives.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

4. EXPLOSIVES (§ 7*)—DANGEROUS PREMISES—EVIDENCE—ADMISSIBILITY.

Where, in an action for the destruction of property by fire caused by an explosion of dust in a grinding mill, the evidence showed that the mill had been shut down for two weeks, and that the explosion occurred the day work was resumed, and that grain in bins, if left undisturbed, would grow hotter and hotter, the testimony of a witness who had worked at one of the bins that the grain in the bin got very hot when he was there 15 days before the explosion was admissible.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

5. TRIAL (§ 84*)—HYPOTHETICAL QUESTIONS—OBJECTIONS—NECESSITY.

A party who objects to a hypothetical question put to an expert on the ground that some of its assumptions are not supported by testimony must call the attention of the trial court to the assumptions objected to, so that the question may be modified or the missing testimony supplied.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 211–218, 220–222; Dec. Dig. § 84.*]

6. EVIDENCE (§ 553*)—OPINION EVIDENCE—HYPOTHETICAL QUESTIONS—ASSUMPTION OF FACTS.

The testimony of a witness to a fact justifies the inclusion of the fact in a hypothetical question, though the jury may or may not believe the witness.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2369–2374; Dec. Dig. § 553.*]

7. EVIDENCE (§ 513*)—OPINION EVIDENCE—COMPETENCY.

An expert on the method of dust removal in grinding mills who testified that he had devised and installed in many plants a method of dust removal, and that the method had operated successfully, and who referred to another system devised by another, was properly permitted to explain how his system operated to avoid an explosion of dust liable to generate in mills, and whether it was impracticable to use his method in a building that was an elevator and grinding mill combined, and whether he knew of more than two other systems of dust collectors, and whether or not the principle was the same in all systems, to enable the jury to weigh his specific statement that his system was adapted to a building that was an elevator and grinding mill combined.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2317, 2318; Dec. Dig. § 513.*]

8. WITNESSES (§ 372*)—CROSS-EXAMINATION—IMPEACHMENT.

Where the court ruled that the details of the matter called for by a question on cross-examination of a witness as to whether or not he had

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

had trouble with the cross-examining party over a debt he owed him should not be gone into, and the witness merely stated that there was a little difference between them, the allowance of the question was not erroneous.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1192–1199; Dec. Dig. § 372.*]

9. EXPLOSIVES (§ 7*)—DANGEROUS PREMISES—EXPLOSIONS—FIRES.

In an action for the destruction of property by fire caused by an explosion of dust in a grinding mill, evidence *held* to support a finding of actionable negligence of the operator of the mill in permitting the collection of explosive dust.

[Ed. Note.—For other cases, see Explosives, Cent. Dig. § 3; Dec. Dig. § 7.*]

10. APPEAL AND ERROR (§ 1068*)—HARMLESS ERROR—ERRONEOUS INSTRUCTIONS.

Where, in an action for the destruction of property by fire, the damages awarded were less than the amount which plaintiff proved was the actual value of the property, errors in instructions on the subject of exemplary damages were harmless, though the value of some of the articles destroyed was disputed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4225–4228, 4230; Dec. Dig. § 1068.*]

In Error to the Circuit Court of the United States for the District of Vermont.

Action by Elwyn H. Grice against the Quaker Oats Company. There was a judgment for plaintiff, and defendant brings error. Affirmed.

This cause comes here upon a writ of error to review a judgment entered upon the verdict of a jury in favor of defendant in error, who was plaintiff below. The action was brought to recover damages occasioned by the destruction by fire of the dwelling house and buildings occupied by plaintiff and their contents, alleged to be caused by the negligence of defendant. Defendant for several years before the fire had been operating a plant at Richford, Vt., consisting of a grinding mill and elevator building, with other structures connected therewith. This plant was used by defendant for the manufacture of mixed feed. This manufacture involved the elevation and storage of whole grain, the grinding of grain, the elevation, storage, and mixing of certain finely ground products manufactured elsewhere and shipped to this plant in bulk or in bags. As a result of these operations, large quantities of dust accumulated in the main building, on the floor, the beams and other exposed surfaces above the floor, and when the machinery was running the vibration of the building would cause the dust to rise or to sift off into the atmosphere, which became so dense that there "was trouble in looking through it." This dust was well known to be a combustible substance, which, when diffused and mixed with air, would upon the application of a flame or spark, ignite and explode.

On the afternoon of October 7, 1908, a violent explosion occurred in the main building, which was followed by a fire which entirely consumed that building, and which was communicated to the adjoining buildings of plaintiff. Several lives were lost as a consequence of the explosion, and no living witness testified as to seeing a flame or a spark in the building just prior to the explosion; but the testimony warrants the conclusion, and apparently no one disputes it, that the explosion was caused by the conjunction of the inflammable dust and some spark or flame.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Wm. B. C. Stickney, Rufus E. Brown, and Gaylord F. Ladd, for plaintiff in error.

Warren R. Austin, Max L. Powell, and John W. Redmond, for defendant in error.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

PER CURIAM. [1] Although the declaration avers two grounds of negligence—accumulation of inflammable dust and spontaneous combustion of some ground grain (shives) which had been allowed to remain undisturbed in a bin—the main thing relied on by the plaintiff was the dust. This is manifest from his counsel's opening address (which has been printed in the record) and from the testimony. If the jury were satisfied that the cause of the explosion was the presence of this dust, and that reasonable care had not been taken to remove so much of it as to render the premises safe, they were warranted in finding defendant negligent, even though they were not satisfied that the flame was produced by spontaneous combustion. If premises are allowed to become unsafe because they are filled with dust which would explode on the application of spark or flame, and the exercise of reasonable care would have prevented the premises from becoming thus unsafe, the person whose neglect brought about such a dangerous condition would not be excused because the actual spark which fired the train was produced by some intruder undertaking to light his pipe.

There was abundance of proof that there had never been any real effort to get rid of dust accumulations. All there is on this point is the statement of the witness Marsha, that they "used to sweep the floor when they were not at work on other work." All the other places where dust could lodge and be set free by jarring were wholly neglected.

[2] There was testimony from which the jury could reasonably conclude that there was more than one system of dust removal which, if installed and properly operated, would have reduced the volume of suspended dust sufficiently to avoid the risk of its exploding in the presence of a flame. There is no testimony controverting that given by the witness Day; not a suggestion that his system does not accomplish all that he claims for it, nor that there was anything in the structure of this particular plant which would make it impracticable, or even difficult, to introduce such a system. In reference to the evidence relating to devices for the allaying and removal of dust, the judge charged the jury:

"If you find that there was a known device in common use and adaptable to the work that was being done in that building, which a man of ordinary prudence would adopt, to keep dust out of the air, then it was the duty of the defendant to have installed such a device, and the failure to install such a device would be negligence on the part of the defendant."

Defendant excepted to this portion of the charge, but it is so manifestly an accurate statement of the law that it would be a waste of time to discuss it. With this instruction as their guide, and upon the testimony which this record discloses, it is difficult to conceive how

any intelligent jury could do otherwise than find that defendant was negligent in that respect.

[3] Such a finding would sustain a general verdict against defendant. It is unnecessary, therefore, to discuss the other branch of the case, viz.:

"Whether the fire that ignited the dust was caused by defendant's negligence in allowing spontaneous combustion to be generated in its stored shives."

This question was separately submitted for a special verdict, and was answered in the affirmative. But the jury was told that the defendant would be liable whether there was negligent spontaneous combustion or whether there was a negligent accumulation of dust which was ignited by a flame or spark which had not been produced by any negligence of defendant. It must not be assumed from our failure further to discuss the evidence that we assent to the defendant's contention that there was not sufficient testimony to support the jury's verdict on the special question. With a general verdict against the defendant it is unnecessary to do so. Upon whose suggestion this special finding was asked for does not appear, nor what purpose it was expected to subserve. If it were intended to ascertain whether the jury found defendant negligent under both charges or only under one, the question should have been supplemented with another concerning the removal of dust.

[4] The first six assignments of error are waived. The others may next be considered. The seventh assigns error because the witness Marsha who worked at one of the bins was allowed to testify that the grain (or shives) in the bin got very hot when he was there 15 days before the explosion. It is objected that this was too remote, but the evidence was relevant in view of the fact that the plant was shut down for want of water for two weeks, and that the explosion occurred the very day work was resumed. Moreover, other testimony tended to show that material such as these shives, if left undisturbed, would tend to grow hotter and hotter.

[5, 6] The eighth assignment of error is to a long hypothetical question to the witness Bell, an expert on explosives. The question was objected to on the ground that "there was no evidence tending to show that any such conditions (as the question assumed) existed in this plant at or near the time of the explosion." The colloquy between court and counsel which followed indicates that the assumed conditions then objected to were that the degree of heat assumed to be present in the shives in the bin was the degree testified to by the witness who had worked there 15 days before the explosion. As we have seen, there was evidence in the case tending to show that, if shives were left undisturbed in a bin, they would probably grow hotter. Counsel in reply to an inquiry of the court further objected to the question because it did not appear that the machinery was shut down continuously after the date to which the witness testified. But there is sufficient evidence to show that the machinery was shut down for two weeks because the water supply was cut off. Therefore neither of the objections made on the trial are sound. In

the brief in this court a further assumption in the hypothetical question is objected to, viz., that the bin was "chuck full of shives and so remained for nearly a year." It would be a sufficient answer to this objection that it was not raised at the trial. Counsel who object to a hypothetical question which, when printed, is a page and a half long (and which undoubtedly contains many assumptions which nobody disputes), on the ground that some of its assumptions are not supported by the testimony, should call the attention of the trial judge to the assumptions they object to, so that the question may be modified or the missing testimony supplied. Moreover, one of the witnesses testified that the bin was 70 feet deep and filled with shives for 70 feet; and in response to a question of the court, "How long to your knowledge had this been in the bin?" replied, "I had been there most a year, and it had been there as long as I had been there." The jury might or might not have believed this witness, but his testimony abundantly justified the including of the assumption in a hypothetical question.

[7] Assignments 10, 11, 13, and 14 (assignments 9 and 12 are waived) all deal with questions put to the witness Day, who testified as an expert in regard to a method of dust removal which he had himself devised and installed in many plants where, as he said, it had operated successfully and also to another system, the "Cyclone" devised by some one else. The first question objected to asked witness to explain how his system operated so as to avoid the explosion of dust that is liable to originate in mills. The second question asked if it was impracticable to use his system in a building that was an elevator and grinding mill combined. The third question asked if he knew of more than two other systems of dust collectors; and the fourth asked whether or not the principle is the same in all systems—the suction principle. These questions were certainly unobjectionable in form. This witness was examined by deposition out of court, and we find nothing in his answers to these questions which was objectionable. He was undoubtedly qualified to testify, and it was proper for him to testify concerning the operation of his dust collector and of others in use in places where explosive dust of this sort is produced whether they were mills, elevators, mixing rooms, or a combination of two or more of them. So, too, it was proper to state the principle common to all dust collectors, the Cyclone or others. Such information would be useful to the jury when weighing his specific statement that his system was adapted to a plant like the one in question. No one was called by defendant to controvert this last statement, or indeed any other made by this witness.

[8] The fifteenth assignment of error was to the allowance of a question asking a witness whether or not he had trouble with the plaintiff over a debt he owed the plaintiff. The ground of objection is that, while it is always proper to show that a witness is hostile to the party against whom he is testifying, a general inquiry into that fact is all that should be allowed, neither the cause nor the details of the trouble should be shown. Since the trial judge announced that details should not be gone into, and the witness replied merely,

"There is a little difference between us I think," this assignment calls for no further consideration.

[9] At the close of the entire evidence, the defendant excepted to the submission of the case to the jury on the ground that no actionable negligence was shown—

"because * * * condition of air and dust in the elevator on the day of the accident was the natural and inevitable result of unloading ground feed and grain in the usual course of business, and there is no evidence tending to show that it could have been avoided by the exercise of the care of a prudent man conducting such a feed mixing business."

In view of the testimony concerning the conditions of the mill and the testimony concerning dust collectors, there was evidence to show that the accident could have been avoided by the exercise of care and prudence. A very full statement of this evidence will be found in Barney v. Quaker Oats Co., 82 Atl. 113, Supreme Court of Vermont, May Term, 1911 (not yet officially reported), where this same explosion was the subject of discussion. This assignment of error is unsound.

What has been already said disposes of the seventeenth assignment, which depends for its support on the proposition contended for that there was no evidence tending to show the existence of known practical devices for eliminating dust.

[10] The eighteenth assignment relates to certain instructions to the jury on the subject of exemplary damages. It need not be considered, since, if erroneous, it was harmless, because the jury gave no exemplary damages. The amount awarded, $2,480.55, was less than the amount which plaintiff offered to prove was the actual value of the property destroyed. While the value of some of the articles destroyed was disputed, it would be straining a point to assume that the jury, which gave considerably less than the plaintiff claimed as compensatory damages, could have awarded anything as punitive damages. Theoretically such a thing might be possible, but it is too highly improbable to call for the reversal of the judgment. Undoubtedly the jury were satisfied that plaintiff had not proved his demand up to the limit and so reduced some of the items and rendered their verdict accordingly without giving any consideration to the question of punitive damages.

The judgment is affirmed.